## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSHUA I. PAYNE, | : | Civil No. 3:16-cv-372 |
| | : | |
| Plaintiff | : | (Judge Mariani) |
| | : | |
| v. | : | |
| | : | |
| JOHN KERESTES, *et al.*, | : | |
| | : | |
| Defendants | : | |

### MEMORANDUM

Plaintiff Joshua Payne ("Payne"), an inmate currently confined at the Mahanoy State

Correctional Institution, in Frackville, Pennsylvania ("SCI-Mahanoy"), commenced this

action pursuant to 42 U.S.C. § 1983. (Doc. 1). Named as Defendants are the following

employees of SCI-Mahanoy: John Kerestes, Hugh Beggs, Jessica Carey, Sara Falkson,

Jeanne Macknight, John Muick, John Steinhart, and Michael Vuksta, (collectively,

"Corrections Defendants"). (*Id.* at pp. 2, 5, 6). Also named as a Defendant is Dr. David

Ahner. (*Id.* at p. 6).

Presently pending before the Court is a motion (Doc. 18) to dismiss pursuant to

Federal Rule of Civil Procedure 12(b)(6) by the Corrections Defendants, and a motion (Doc.

16) to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) by Defendant Ahner.

For the reasons set forth below, the Court will grant each of the pending motions and will

grant Payne an opportunity to amend his complaint.

## I.   Standard of Review

A complaint must be dismissed under FED. R. CIV. P. 12(b)(6), if it does not allege

"enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). The plaintiff must

aver "factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct.

1937, 1949, 173 L. Ed. 2d 868 (2009).

"Though a complaint 'does not need detailed factual allegations, . . . a formulaic

recitation of the elements of a cause of action will not do.'" *DelRio-Mocci v. Connolly Prop.*

*Inc.*, 672 F.3d 241, 245 (3d Cir. 2012) (citing *Twombly*, 550 U.S. at 555). In other words,

"[f]actual allegations must be enough to raise a right to relief above the speculative level."

*Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013)

(internal citations and quotation marks omitted). A court "take[s] as true all the factual

allegations in the Complaint and the reasonable inferences that can be drawn from those

facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a

cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v.*

*Abbott Laboratories*, 707 F.3d 223, 231, n.14 (3d Cir. 2013) (internal citations and quotation

marks omitted).

*Twombly* and *Iqbal* require [a district court] to take the following three steps to

2

determine the sufficiency of a complaint: First, the court must take note of the elements a

plaintiff must plead to state a claim. Second, the court should identify allegations that,

because they are no more than conclusions, are not entitled to the assumption of truth.

Finally, where there are well-pleaded factual allegations, a court should assume their

veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere

possibility of misconduct, the complaint has alleged - but it has not show[n] - that the

pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citations and quotation marks

omitted). This "plausibility" determination will be a "context-specific task that requires the

reviewing court to draw on its judicial experience and common sense." *Id.*

However, even "if a complaint is subject to Rule 12(b)(6) dismissal, a district court

must permit a curative amendment unless such an amendment would be inequitable or

futile." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

> [E]ven when plaintiff does not seek leave to amend his complaint after a
> defendant moves to dismiss it, unless the district court finds that amendment
> would be inequitable or futile, the court must inform the plaintiff that he or she
> has leave to amend the complaint within a set period of time.

*Id.*

## II.    Allegations of the Complaint

### A.    Allegations against the Corrections Defendants

3

The claims in the complaint stem from Payne's alleged inadequate mental health treatment at SCI-Mahanoy. (Doc. 1). On May 22, 2014, Payne was transferred to SCI-Mahanoy and placed in the special needs unit ("SNU") in general population. (*Id.* at ¶ 22). Payne alleges that he is a "mentally ill prisoner" and has been diagnosed with "phencyclidine use disorder, severe; schizoaffective disorder, bipolar type; borderline personality disorder; major depressive disorder, impulse control disorder, and a delusional disorder." (Doc. 1, ¶ 16). Due to these illnesses, Payne was assigned a stability code "D" status, indicating that he has the "most serious" need for mental health services. (*Id.* at ¶ 17).

In May 2014, Payne allegedly spoke to Defendant Muick about the mental health programs available at SCI-Mahanoy. (*Id.* at ¶ 23). Defendant Muick allegedly responded, "I will look into it." (*Id.* at ¶ 24). On June 23, 2014, Payne claims that he sent a request to Defendants Muick, Kerestes, Vuksta, Beggs, Ahner, and Macknight stating that his housing block did not have the mental health programs that he needed as an inmate with a stability code "D" status. (*Id.* at ¶ 27). Payne also informed these Defendants that a psychologist had not visited his housing unit, and that he had not been allowed to participate in any mental health programs. (*Id.*). He claims that his requests were not answered. (*Id.* at ¶ 28).

On June 24, 2014, Payne completed a request to staff member form wherein he

4

requested treatment by a psychologist and placement in a mental health program. (*Id.*). He alleges that this request was not answered, however he states that he was treated by a psychologist the following week. (*Id.* at ¶ 29).

In August 2014, Payne was sent to the restricted housing unit ("RHU") pending an investigation for violation of facility rules. (*Id.* at ¶ 33).

Payne claims that he sent requests to Defendants Kerestes, Beggs, Vuksta, Macknight, Ahner, Muick, the Corrections Healthcare Administrator ("CHCA"), and a John Doe about being moved to the SNU and placed in mental health programs. (*Id.* at ¶ 40). He alleges that his requests went unanswered. (*Id.*).

In December 2014, Payne claims that he again sent a request slip to Defendants Kerestes, Beggs, Vuksta, Muick, Ahner, the CHCA, and Macknight wherein he stated that he was "not receiving proper mental health treatment" and has not been able to participate in group sessions. (*Id.* at ¶ 42). Defendant Kerestes allegedly responded that Payne first needed to discuss his concerns with his housing unit team. (*Id.* at ¶ 43).

In January 2015, Payne asserts that he asked Defendant Carey why he was moved to a different cell block. (*Id.* at ¶ 44). Defendant Carey allegedly stated that Defendant Muick initiated his move. (*Id.* at ¶¶ 44-45). She further informed Payne that he was going to remain on the new cell block and he was still classified as a "D" code status. (*Id.* at ¶ 45). Defendant Carey responded to Payne's request slip and informed him that there are no

5

stability "D" groups on his block, but emphasized that he sees psychology and counseling staff regularly. (*Id*. at ¶¶ 46-48). Payne alleges that the psychologist and counselor were not readily available when he needed counseling. (*Id*. at ¶ 48). He claims that he sought additional help by speaking to or sending request slips to the Defendants. (*Id*. at ¶ 49).

In April 2015, Payne attempted suicide by medication overdose. (*Id*. at ¶ 51). Prior to his suicide attempt, Payne allegedly informed Carey, Falkson, and a non-party individual about his feelings and suicidal thoughts. (*Id*.). He was allegedly informed that he would see Defendant Ahner in one week. (*Id*.). After his suicide attempt, Payne was transported to the medical department and held in a psychiatric observation cell ("POC"). (*Id*. at ¶ 52). He alleges that he received a suicide blanket with no smock, and was placed in a "freezing cold cell" for three days. (*Id*.). While in the medical department, Payne was seen by Defendants Falkson and Ahner, who inquired if he was still suicidal. (*Id*. at ¶ 53). Payne alleges that Falkson and Ahner did not help him deal with his depression and did not explore why he attempted suicide. (*Id*.).

In May 2015, Falkson created a constructive coping skills group for stability "D" inmates. (*Id*. at ¶ 54). Payne participated in the weekly group session until it was discontinued in June 2015. (*Id*.). Falkson also started a sleep therapy group which only lasted for one session. (*Id*.).

On June 15, 2015, Payne claims that he filed a grievance against all Defendants.

6

(*Id.* at ¶ 55). Defendant Macknight denied the grievance as frivolous. (*Id.* at ¶ 56). Payne claims that copies of the denial were sent to Defendant Kerestes and other non-party individuals. (*Id.* at ¶ 56). On August 20, 2015, Payne appealed the denial of his grievance to Defendant Kerestes. (*Id.* at ¶ 57). He then claims that Defendant Beggs denied his appeal, who allegedly "back[]dated" his response. (*Id.* at ¶ 57).

On or about September 5, 2015, Payne alleges that he sent request slips to Defendants Carey, Kerestes, Beggs, Vuksta, Macknight, and Muick requesting to be moved to his previous housing block and returned to the mental health groups available on that block. (*Id.* at ¶ 60). On September 9, 2015, Defendant Carey responded to the grievance and suggested that Payne attend Defendant Falkson's group sessions. (*Id.* at ¶ 61). She also suggested that Payne write to Defendant Muick. (*Id.*). Payne then sent request slips to Defendants Falkson and Muick wherein he asked to be placed in their group sessions. (*Id.* at ¶ 62). Payne alleges that he did not receive responses. (*Id.*).

Payne asserts that he is currently being treated by a different psychiatrist, Dr. T. Blatt. (*Id.* at ¶ 65).

### B.    Allegations against Defendant Ahner

In June 2014, Payne was treated by psychiatrist Defendant Ahner at SCI-Mahanoy. (*Id.* at ¶¶ 23-24). Payne allegedly informed Defendant Ahner that voices were telling him to kill himself, he was not able to sleep at night, he experienced mood swings, and believed

7

that the nurses at the medication window were trying to poison and kill him. (*Id.* at ¶ 24). Defendant Ahner allegedly told Payne, "no one is trying to poison or kill you," and asked Payne if he had any other concerns. (*Id.* at ¶ 25). Payne alleges that he asked Defendant Ahner about the availability of mental health programs at SCI-Mahonoy. (*Id.*). Defendant Ahner allegedly responded that such programs were not offered at SCI-Mahonoy. (*Id.*). Payne also alleges that he asked Defendant Ahner to see a psychologist. (*Id.*). Defendant Ahner allegedly advised Payne to send a request slip to the psychology department or inform a staff member of his request. (*Id.*). During this consultation, Payne asserts that he informed Defendant Ahner that he was depressed, was having trouble with coping due to his mental health, and was contemplating suicide. (*Id.* at ¶ 26). Defendant Ahner increased Payne's medication and indicated that he would see him again in five to six weeks. (*Id.*).

On June 23, 2014, Payne requested an appointment with a psychologist. (*Id.* at ¶ 27). One week later, Payne alleges that he was seen by a psychologist, but does not remember the psychologist's name. (*Id.* at ¶ 29). Payne states that he informed the psychologist that his medications were not working because the voices were back, and the voices were demanding that he kill himself. (*Id.* at ¶ 30). Payne states that he also asked whether the prison offered any mental health programs. (*Id.* at ¶ 30). In response, the psychologist stated that SCI-Mahonoy did not have any mental health programs available at the moment. (*Id.* at ¶ 31). The psychologist advised Payne to relax and stated that he

8

would note a referral for a medication readjustment. (*Id.*). The psychologist also advised

Payne to start taking the medication prescribed by Dr. Ahner. (*Id.* at ¶ 32).

Payne next alleges that he spoke to Defendant Ahner on a few occasions, because

he "was missing a lot of days of taking his medication." (*Id.* at ¶ 49). Defendant Ahner

asked Payne why he was not taking his medication, and Payne responded that he believed

"the nurses are trying to poison and kill him like they poisoned and killed [his] sister in

2013." (*Id.* at ¶ 50).

After Payne's suicide attempt in April 2015, he alleges that Defendant Ahner treated

him, and inquired if he was still suicidal. (*Id.* at ¶¶ 51-53). Payne claims that Defendant

Ahner gave him "no avenues on how to deal with the voices or depression, nor did [he] seek

to find out why Plaintiff even tried to kill himself." (*Id.* at ¶ 53).

## III. Discussion

Section 1983 of Title 42 of the United States Code offers private citizens a cause of

action for violations of federal law by state officials. *See* 42 U.S.C. § 1983. The statute

provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom,
> or usage, of any State or Territory or the District of Columbia, subjects, or
> causes to be subjected, any citizen of the United States or other person
> within the jurisdiction thereof to the deprivation of any rights, privileges, or
> immunities secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper proceeding for
> redress. . . .

9

*Id.*; *see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002); *Kneipp v. Tedder*, 95

F.3d 1199, 1204 (3d Cir. 1996). To state a claim under § 1983, a plaintiff must allege "the

violation of a right secured by the Constitution and laws of the United States, and must

show that the alleged deprivation was committed by a person acting under color of state

law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

## A.    Personal Involvement

The Corrections Defendants argue that Payne fails to state a claim against them

because they lack personal involvement in the alleged wrongs. (Doc. 20, pp. 13-14). The

Court finds merit in this argument.

Individual liability can be imposed under section 1983 only if the state actor played

an "affirmative part" in the alleged misconduct and "cannot be predicated solely on the

operation of respondeat superior." *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005)

(quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998)). "A defendant in a civil

rights action must have personal involvement in the alleged wrongs. . . . Personal

involvement can be shown through allegations of personal direction or of actual knowledge

and acquiescence." *Rode*, 845 F.2d at 1207-08; *see also, Rizzo v. Goode*, 423 U.S. 362

(1976); *Atkinson v. Taylor*, 316 F.3d 257 (3d Cir. 2003). Such allegations, however, must

be made with appropriate particularity in that a complaint must allege the particulars of

conduct, time, place, and person responsible. *Evancho*, 423 F.3d at 354; *Rode*, 845 F.2d at

10

1207-08. Alleging a mere hypothesis that an individual defendant had personal knowledge or involvement in depriving the plaintiff of his rights is insufficient to establish personal involvement. *Rode*, 845 F.2d at 1208.

There are simply no allegations that Defendants Kerestes, Beggs, Vuksta, Macknight, Steinhart, Muick, and Carey provided any mental health treatment to Payne. The only claims against these Defendants pertain to their alleged mishandling of grievances. (Doc. 1). The "failure of a prison official to provide a favorable response to an inmate grievance is not a federal constitutional violation." *Flanagan v. Shively*, 783 F. Supp. 922, 931-32 (M.D. Pa. 1992), *aff'd*, 980 F.2d 722 (3d Cir. 1992). Thus, insofar as these Corrections Defendants are sued in their capacity for denying or mishandling Payne's grievances, dissatisfaction with responses to an inmate's grievances does not support a constitutional claim. *See Alexander v. Gennarini*, 144 F. App'x 924 (3d Cir. 2005) (concluding that involvement in the post-incident grievance process is not a basis for § 1983 liability); *Cole v. Sobina*, 2007 WL 4460617, at *5 (W.D. Pa. 2007) ("[M]ere concurrence in a prison administrative appeal process does not implicate a constitutional concern."). Consequently, Defendants Kerestes, Beggs, Vuksta, Macknight, Steinhart, Muick, and Carey are entitled to dismissal of the claims against them based on their lack of personal involvement in the alleged wrongs.

With respect to Defendant Falkson, Payne alleges that he was seen by Falkson in

the psychiatric observation cell after his suicide attempt. (Doc. 1, ¶ 53). He alleges that

Defendant Falkson inquired if he was still suicidal, and that he later participated in a group

therapy session created by Falkson. (*Id.*). At this procedural juncture, viewing the facts in

the light most favorable to the Payne, he has alleged facts sufficient to infer that Defendant

Falkson may have been personally involved in the alleged denial of treatment for his mental

health illness.

## B.    Eighth Amendment Claim

The Eighth Amendment's proscription against cruel and unusual punishment

requires that prison officials provide inmates with adequate medical care. *See Estelle v.*

*Gamble*, 429 U.S. 97, 103-05 (1976). In order to establish an Eighth Amendment medical

claim, a plaintiff "must show (i) a serious medical need, and (ii) acts or omissions by prison

officials that indicate deliberate indifference to that need." *Natale v. Camden Cty.*

*Correctional Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (citing *Rouse v. Plantier*, 182 F.3d

192, 197 (3d Cir. 1999)). A serious medical need is "one that has been diagnosed by a

physician as requiring treatment or one that is so obvious that a lay person would recognize

the necessity for a doctor's attention." *Monmouth Cty. Corr. Institutional Inmates v.*

*Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987). In addition, "if unnecessary and wanton

infliction of pain results as a consequence of denial or delay in the provision of adequate

medical care, the medical need is of the serious nature contemplated by the eighth

12

amendment." *Id.* (citation omitted). A prison official acts with deliberate indifference to an inmate's serious medical needs when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A mere difference of opinion between the prison's medical staff and the inmate regarding the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment. See *Farmer v. Carlson*, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988); *see also McCracken v. Jones*, 562 F.2d 22, 24 (10th Cir. 1977); *Smart v. Villar*, 547 F.2d 112, 113 (10th Cir. 1976), *cert. denied*, 450 U.S. 1041 (1981).

In the instant action, the Court finds that Payne's mental health illness rises to the level of a serious medical condition for purposes of the Eighth Amendment analysis. The Court must therefore determine whether Payne has pled a deliberate indifference to that need.

### 1. Corrections Defendants

For purposes of Eighth Amendment medical claims, non-medical correctional staff may not be "considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993). The rationale for this rule has

been aptly explained by the United States Court of Appeals for the Third Circuit as follows:

> If a prisoner is under the care of medical experts . . . , a non-medical prison
> official will generally be justified in believing that the prisoner is in capable
> hands. This follows naturally from the division of labor within a prison.
> Inmate health and safety is promoted by dividing responsibility for various
> aspects of inmate life among guards, administrators, physicians, and so on.
> Holding a non-medical prison official liable in a case where a prisoner was
> under a physician's care would strain this division of labor. Moreover, under
> such a regime, non-medical officials could even have a perverse incentive not
> to delegate treatment responsibility to the very physicians most likely to be
> able to help prisoners, for fear of vicarious liability. Accordingly, we conclude
> that, absent a reason to believe (or actual knowledge) that prison doctors or
> their assistants are mistreating (or not treating) a prisoner, a non-medical
> prison official . . . will not be chargeable with the Eighth Amendment scienter
> requirement of deliberate indifference.

*Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004). Courts have repeatedly held that, absent

some reason to believe that prison medical staff are mistreating prisoners, non-medical

corrections staff who refer inmate medical complaints to physicians may not be held

personally liable for medically-based Eighth Amendment claims. *See, e.g., id.* at 236-37

(citing *Durmer*, 991 F.2d at 69); *Garvey v. Martinez*, No. 08- 2217, 2010 WL 569852, at \*6-7

(M.D. Pa. 2010); *Hodge v. United States*, No. 06-1622, 2007 WL 2571938, at \*5-6 (M.D. Pa.

2007). Moreover, a claim of a constitutional deprivation cannot be premised merely on the

fact that the named defendant was the prison warden, or a prison supervisor, when the

incidents set forth in the complaint occurred. *See Rode*, 845 F.2d at 1207.

Applying these constitutional benchmarks, it is apparent that, with respect to the

non-medical Defendants – Kerestes, Beggs, Vuksta, Macknight, Steinhart, Muick, and

14

Carey – Payne's complaint fails to state a claim upon which relief can be granted. A review of the complaint confirms that there are no specific assertions that Defendants Kerestes, Beggs, Vuksta, Macknight, Steinhart, and Muick had any personal involvement in the purported violations of Payne's rights under the Eighth Amendment. (*See generally* Doc. 1). Payne does not allege that these Defendants provided him with medical or psychiatric care, refused to provide medical or psychiatric care, or prevented him from receiving such care. The Corrections Defendants knew that Payne was under the care the psychiatric staff and deferred to the judgment of his medical treatment team. Payne acknowledges that he is suing certain Corrections Defendants because they are "supervisory officials." (Doc. 28, pp. 6-8). Payne's claims are, in essence, nothing more than an assertion of *respondeat superior* liability which seeks to hold these Defendants liable based on their supervisory roles. This ground of constitutional liability has been squarely rejected by the courts. *See Rode*, 845 F.2d at 1207.

The only Corrections Defendants who Payne attempts to hold liable based on their purported involvement in his mental health treatment are Carey and Falkson. In April 2015, Payne alleges that he informed Defendants Falkson and Carey "how [he] was feeling and what [he] wanted to do to [himself]." (Doc. 1, ¶ 51). In response, Payne alleges that he was advised that he would see his psychiatrist, Dr. Ahner, in one week. (*Id.*). Payne alleges that he attempted suicide later that evening and was immediately transferred to a

psychiatric observation cell. (*Id.* at ¶ 52). With respect to these allegations against Defendant Carey, a non-medical Defendant, she cannot be considered deliberately indifferent to a serious medical need simply because she deferred to the psychiatric staff who were already treating Payne. *See Durmer*, 991 F.2d at 68.

The Court finds that the allegations against psychologist Falkson, the only Corrections Defendant who appears to be associated with the medical department, are insufficient to state a claim for relief. (Doc. 1, ¶ 11). Payne does not allege that Defendant Falkson was the individual who advised him that he would be treated by Dr. Ahner after he expressed suicidal thoughts. Moreover, Payne admits that he was immediately placed in a psychiatric observation cell, and was promptly seen by Defendant Falkson. (*Id.* at ¶¶ 52-53). Payne acknowledges that Falkson inquired about any remaining suicidal thoughts, though he seemingly asserts that Falkson did not provide adequate treatment by failing to help with his depression and failing to explore why he attempted suicide. (*Id.*). Although Payne may not be wholly satisfied with the treatment he received from Defendant Falkson, his actions do not amount to deliberate indifference to a serious medical need. Instead, Payne appears to be dissatisfied with Defendant Falkson's treatment. It is well-established that disagreements as to the proper course of medical treatment simply do not suffice to satisfy the deliberate indifference standard. *See Carpenter v. Kloptoski*, No. 08-CV-2233, 2012 WL 983565, at *6 (M.D. Pa. Mar. 22, 2012) (citing *White v. Napoleon*, 897 F.2d 103,

110 (3d Cir. 1990)) (observing that "a prisoner's subjective dissatisfaction with his medical care does not in itself indicate deliberate indifference"). Consequently, Payne's complaint fails to state an Eighth Amendment claim against Defendant Falkson. Payne will be afforded the opportunity to cure the deficiencies of this claim against Defendant Falkson.

### 2. Defendant Ahner

The allegations in the complaint demonstrate that Defendant Dr. Ahner was not deliberately indifferent to Payne's serious medical needs. The complaint provides that Defendant Ahner treated Payne shortly after his arrival to SCI-Mahanoy. During the initial consultation, Defendant Ahner assured Payne that no one was trying to poison or kill him, he asked Payne about his other concerns, and increased his medication based on Payne's depressive and suicidal thoughts. (Doc. 1, ¶¶ 25-26). Defendant Ahner also informed Payne that, unfortunately, SCI-Mahanoy did not have the mental health programs he desired. (Id. at ¶ 25).

Payne next alleges that he spoke to Defendant Ahner on a few occasions because he was not taking his medication. (Doc. 1, ¶ 49). Payne reported to Defendant Ahner that he was not taking his medication due to his belief that the nurses were trying to poison and kill him. (Id. at ¶ 50).

Defendant Ahner then treated Payne after his suicide attempt in April 2015. (Id. at ¶¶ 51-53). Defendant Ahner inquired if Payne was still suicidal. (Id.). Payne seemingly

claims that Defendant Ahner should have offered different treatment. (*Id.* at ¶ 53).

By Payne's own account, he received mental health treatment and medication at SCI-Mahanoy. However, he alleges that he did not receive the "needed" mental health treatment. (Doc. 1, ¶ 27). Additionally, Payne requested placement in mental health programs that simply did not exist at SCI-Mahanoy. To the extent that Payne is dissatisfied with the treatment he received, i.e., inadequate availability of mental health facilitators and inadequate mental health programs at SCI-Mahanoy, such allegations, at best, demonstrate Payne's disagreement with medical treatment. Payne is not entitled to convert his dissatisfaction with that care into a constitutional claim. Payne's personal opinions as to the availability of mental health personnel and mental health treatment programs amount to nothing more than a difference of opinion as to a course of treatment, which does not amount to a constitutionally cognizable claim. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (holding that "mere disagreement as to the proper medical treatment" is insufficient to state an Eighth Amendment claim) (citing *Monmouth Cty.*, 834 F.2d at 346); *see also Norris v. Frame*, 585 F.2d 1183, 1186 (3d Cir. 1978) ("Where the plaintiff has received some care, inadequacy or impropriety of the care that was given will not support an Eighth Amendment claim."). This is particularly true in light of the fact that there are no allegations in the complaint that Defendant Ahner intentionally withheld psychiatric treatment from Payne in order to inflict pain or harm upon him. *See Farmer*, 685 F. Supp.

18

at 1339; *Rouse*, 182 F.3d at 197.  Additionally, courts will not second guess whether a particular course of treatment is adequate or proper.  *See Parham v. Johnson*, 126 F.3d 454, 458 n.7 (3d Cir. 1997) (quoting *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979)).  Based on the foregoing, Payne's complaint fails to articulate a plausible Eighth Amendment claim against Defendant Dr. Ahner.  Payne will be afforded the opportunity to file an amended complaint to cure the defects with respect to this claim.

## C.    Fourteenth Amendment Claim

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike.  U.S. CONST. amend. XIV; *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyer v. Doe*, 457 U.S. 202, 216 (1982)).  To state an equal protection claim, a plaintiff must allege that: (1) he or she was a member of a protected class, (2) he or she was treated differently from similarly situated persons outside of his or her protected class, and, (3) the resultant discrimination was purposeful or intentional rather than incidental. *Tillman v. Lebanon Cty. Corr. Facility*, 221 F.3d 410, 423-24 (3d. Cir. 2000).

An equal protection claim can also be brought by a "class of one," a plaintiff alleging that he has been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528

U.S. 562, 564 (2000); *Williams v. Morton*, 343 F.3d 212, 221 (3d Cir. 2003); *see also*

*Jean-Pierre v. Bureau of Prisons*, 497 F. App'x 164, 168 (3d Cir. 2012). If a distinction

between persons does not implicate a suspect or quasi-suspect class, state action will be

upheld if it is rationally related to a legitimate state interest. *See Tillman*, 221 F.3d at 423.

When alleging the existence of similarly situated individuals, plaintiffs "cannot use

allegations . . . that amount to nothing more than 'conclusory, boilerplate language' to show

that he may be entitled to relief," and "bald assertion[s] that other[s] . . . were treated in a

dissimilar manner" will not survive dismissal. *Young v. New Sewickley Twp.*, 160 F. App'x

263, 266 (3d Cir. 2005) (citing *Evancho*, 423 F.3d at 354-55); *see also Twombly*, 550 U.S.

at 561 (requiring more than a "wholly conclusory statement of claim" to survive a motion to

dismiss). Instead, plaintiffs must identify similarly situated individuals and allege "occasions

or circumstances" of differential treatment. *Young*, 160 F. App'x at 266; *see also Twombly*,

550 U.S. at 563 (requiring a plaintiff to plead a set of facts consistent with legal allegations

in complaint to survive dismissal).

In the complaint, Payne generally alleges that he was denied access to "mental

health groups, activities, programs, services, and any other rehabilitative sessions that [are]

offered to other 'C' and 'D' prisoners who are similarly situated in this institution." (Doc. 1, ¶

75). However, Payne acknowledges that he attended group therapy sessions, and attended

regular meetings with the psychiatric review team. (*Id.* at ¶¶ 54, 62). Moreover, Payne also

20

admits that he was repeatedly advised that "they do not have any mental health groups, programs, or services [at SCI-Mahonoy] at the moment." (*Id.* at ¶ 31). Payne accordingly fails to establish that he was treated differently than similarly situated inmates. Rather, the allegations reveal that there were no mental health programs available at SCI-Mahanoy, thus no inmates had access to the services to which Payne claims he was denied access. Consequently, the Equal Protection claims fails as a matter of law and will be dismissed.

### D.   Americans with Disabilities Act and Rehabilitation Act Claims

"Whether suit is filed under the Rehabilitation Act or under the [ADA], the substantive standards for determining liability are the same." *McDonald v. Pa. Dep't of Pub. Welfare*, 62 F.3d 92, 95 (3d Cir. 1995). However, the Rehabilitation Act also requires plaintiff to show that the he was excluded from a "program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

Title II of the Americans with Disabilities Act ("ADA") provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. As used in Title II of the ADA, "public entity" is defined as: "(A) any State or local government; (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and (C) the National Railroad Passenger Corporation, and any commuter

21

authority (as defined in section 24102(4) of Title 49)." 42 U.S.C. § 12131(1). State prisons

fall squarely within the statutory definition of "public entity" in Title II of the ADA.

*Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998). However, the plain

language of § 12132 applies only to public entities not individuals. *Yeskey v.*

*Commonwealth of Pennsylvania*, 76 F. Supp.2d 572, 575 (M.D. Pa. 1999) (holding that

individuals are not liable under Title II because it prohibits discrimination in programs of a

"public entity" or discrimination "by any such entity" and "public entity" is not defined in Title

II to include individuals). The Court finds that the Corrections Defendants and Defendant

Ahner do not qualify as public entities as defined by the ADA. Therefore, the ADA is

inapplicable to the individually named Defendants, and the motions to dismiss will be

granted on this ground.

### E.     Pennsylvania's Mental Health Procedures Act

The Court declines to address Payne's pendent state law claim at this procedural

juncture. If Payne files an amended complaint, and Defendants were to establish

meritorious defenses to the federal law claims, the Court would presumably decline to

exercise supplemental jurisdiction over the state law claim. *See Borough of W. Mifflin v.*

*Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995) ("where the claim over which the district court

has original jurisdiction is dismissed before trial, the district court must decline to decide the

pendent state claims unless considerations of judicial economy, convenience, and fairness

to the parties provide an affirmative justification for doing so").

## IV.    Leave to Amend

When a complaint fails to present a prima facie case of liability, courts should

generally grant leave to amend before dismissing a complaint. *See Grayson v. Mayview*

*State Hosp.,* 293 F.3d 103, 108 (3d Cir. 2002); *Shane v. Fauver,* 213 F.3d 113, 116-17 (3d

Cir. 2000). Specifically, the Third Circuit has admonished that when a complaint is subject

to dismissal for failure to state a claim, courts should liberally grant leave to amend "unless

such an amendment would be inequitable or futile." *Phillips,* 515 F.3d at 245 (citing *Alston*

*v. Parker,* 363 F.3d 229, 235 (3d Cir. 2004)). The federal rules allow for liberal

amendments in light of the "principle that the purpose of pleading is to facilitate a proper

decision on the merits." *Foman v. Davis,* 371 U.S. 178, 182 (1962) (citations and internal

quotations omitted). For these reasons, the Court concludes that Payne should be

afforded an opportunity to amend his complaint with respect to his Eighth Amendment claim

against Defendants Falkson and Ahner.

## V.    Conclusion

Based on the foregoing, Defendants' motions (Docs. 16, 18) to dismiss will be

granted. A separate Order shall issue.

Dated: March ___, 2017

Robert D. Mariani
United States District Judge

23